# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>YOIRLAN TOME ROJAS,<br><br>　　　　Defendant. | No. CR14-4015-MWB<br><br>***REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS*** |

## I.　　INTRODUCTION

Defendant Yoirlan Tome Rojas is charged by superseding indictment (Doc. No. 29) with two counts of using a counterfeit access device, one count of possession of fifteen or more counterfeit access devices, one count of money laundering and two counts of aggravated identity theft. He filed a motion (Doc. No. 81) to suppress evidence on September 9, 2014. Plaintiff (the Government) filed a resistance (Doc. No. 87) on September 25, 2014. Rojas did not file a reply. The Trial Management Order (Doc. No. 11) assigns motions to suppress to me to conduct any necessary evidentiary hearings and to prepare reports on, and recommended dispositions of, those motions.

I held an evidentiary hearing on September 29, 2014. Assistant United States Attorney Jamie Bowers appeared for the Government while Rojas appeared personally and with his attorneys, Christopher Roth and Paul Forney. The Government presented the testimony of Storm Lake Police Department (SLPD) Officer Matt Younie and Detective Brian Flikeid. The Government also introduced the following exhibits, all of which were admitted into evidence without objection:

　　*Government Exhibit 1*:　　11/12/13 Police Squad Car Video

| | |
|---|---|
| *Government Exhibit 2:* | Buena Vista County application for search warrant for 801 Erie St Apt #8 |
| *Government Exhibit 3:* | Buena Vista County application for search warrant for storage locker |
| *Government Exhibit 4:* | Two photographs (truck) |
| *Government Exhibit 5:* | Two photographs (doors with #8) |
| *Government Exhibit 6:* | Two still images from Wal-Mart surveillance video (11/6/13) |
| *Government Exhibit 7:* | Four still images from Wal-Mart surveillance video (9/13/13) |
| *Government Exhibit 8:* | Wal-Mart surveillance video (11/6/13) |
| *Government Exhibit 9:* | Wal-Mart surveillance video (9/13/13) |
| *Government Exhibit 10:* | Photograph (aerial view of 1708 Rose Lane) |

Rojas called no witnesses but did introduce Defense Exhibit E, a police bulletin, which was admitted into evidence without objection. The motion is now fully submitted.

## II. FINDINGS OF FACT

Based on the evidence presented, I make the following findings of fact (additional findings will be included in the analysis of specific arguments as necessary):

On November 6, 2013, SLPD was contacted by an individual in Colorado who reported that his credit card had been used at the Storm Lake Wal-Mart store without his permission. A SLPD officer went to the store, spoke with the store's loss prevention manager and gathered video surveillance evidence and receipts concerning the transaction at issue. The in-store video shows a man in tan Carhart-style coveralls using numerous credit cards to purchase gift cards at two different registers. The parking lot video shows the same suspect driving a two-toned (dark over gray) Chevy truck. The truck has certain

2

distinguishing features, including a dark stripe on the gray portion, a box or tank in the truck bed, adjacent to the cab, a black grill, chrome mirrors and after-market rims. Based on this information, the investigating officer posted a bulletin in the station alerting all SLPD officers to be on the lookout for a Hispanic male suspect driving the Chevy truck. Def. Ex. E. The bulletin included still photos of the suspect and the truck. *Id.*

On November 12, 2013, SLPD Officer Matt Younie was on patrol and observed a distinctive Chevy truck that appeared to match the truck described in the bulletin. Younie testified he recognized the truck because of several features, including the two-tone paint, the tank or box in the bed of the truck, the chrome mirrors and the wheel rims. At that time he was unable to see the driver of the truck. However, he followed it without activating his emergency lights until the truck pulled into a residential driveway off East 4th Street in Storm Lake. The driver parked the truck two or three car lengths from the street and got out of the vehicle. Younie pulled into the driveway behind the truck and saw that the driver was wearing tan Carhart-style coveralls.

Younie approached the driver and asked for his driver's license. The driver complied. The license identified the driver as defendant Yoirlan Tome Rojas and listed his address as 801 Erie Street, Apartment 8. Younie told Rojas that the truck and a suspect who looked similar to him were implicated in a credit card scheme at Wal-Mart. He then advised Rojas that he would need to come to the police station to answer questions. Rojas asked to speak with his wife for a moment and was permitted to do so. Rojas walked up to the porch of the home and had a brief conversation with a female occupant.

After this conversation, Younie escorted Rojas to the squad car and placed him into the back seat. Younie testified that he did not place handcuffs on Rojas because he was being cooperative. While Rojas was getting into the car, Younie asked him for the address of their current location so he could request a tow for the truck. Rojas initially answered with his own address: 801 Erie Street, Apartment 8. Younie then clarified the question and Rojas stated that the address was 1708 Rose Lane. Younie did not ask

additional questions during the drive to the station. Once there, Rojas was placed in an interview room. After being advised of his *Miranda* rights, Rojas invoked his right to refuse to answer questions. In response to routine booking-process questions, however, he stated that his address was 801 Erie Street, Apartment 8.

After bringing Rojas to the police station, Younie fielded a call from an individual in Michigan who reported that a fraudulent credit card transaction had occurred on September 13, 2013, at the same Storm Lake Wal-Mart store. Younie followed up on the report, contacting the Wal-Mart loss prevention team and obtaining store video and other evidence concerning that transaction.

Meanwhile, SLPD Detective Flikeid arrived at 1708 Rose Lane to view the truck Rojas had been driving. Flikeid walked around the truck, which was still parked in the driveway, and determined it to be the same truck depicted in the Wal-Mart store video associated with the first credit card fraud report. Flikeid ran the truck's license plates and learned that the truck was registered to Rojas at the 801 Erie Street, Apartment 8, address. Based on Younie's encounter and the information gathered so far, Flikeid applied for a warrant to search the apartment at that address.

Flikeid presented an application for search warrant to a state court magistrate late that evening and answered questions posed by the magistrate. The magistrate made several notations on the application, including a note that the address to be searched "is reflected as the address of Yoirlan Tome Rojas on his drivers license and was acknowledged by Yoirlan Tome Rojas as his residence." Gov't Ex. 2 at 11. The magistrate found probable cause to issue the requested warrant and issued it on November 13, 2013 at 12:29 a.m.

Flikeid and Younie, along with other SLPD officers, then went to 801 Erie Street, Apartment 8, to execute the search warrant. The officers noted that the apartment building includes, in a common hallway, storage closets with numbers that correspond to the apartment unit numbers. For example, one storage closest is marked as number 8, suggesting that it may be associated with apartment number 8.

4

Once inside Rojas' apartment, the officers found a set of keys in plain view on a coffee table and suspected that one of the keys would open storage closet number 8. They went to that closet, inserted the key and confirmed that it opened the door to that closet. They then opened the door briefly to look inside. At that point, according to Flikeid, he became concerned that the existing warrant might not authorize a search of the separate closet unit. He reviewed the warrant and noted that it did not contain language that is sometimes inserted that would have authorized that search. Flikeid closed the door and instructed Younie to stand guard and secure the closet while Flikeid sought a second warrant.

Flikeid presented a second warrant application to the same magistrate, who again asked questions and made handwritten notations on the application and proposed warrant. Among other things, she noted that Flikeid had located the keys to the storage closet in plain sight on the coffee table in the apartment. The magistrate found probable cause to issue the second warrant and issued it on November 13, 2013, at 3:32 a.m. Gov't Ex. 3 at 12. The second warrant expressly authorized a search of "a storage closet located in the hallway of the apartment complex" that "is labeled in the door with the #8." *Id.* at 13. In executing the second warrant at the storage closet, the officers found and seized incriminating evidence including hundreds of manufactured credit cards, assorted mail connecting Rojas with the apartment, Rojas's passport, a bank checkbook, a Tyson Foods ID card with the name Jose Mazo and Rojas's photo and a list of Wal-Mart stores.

### III. DISCUSSION

Rojas argues the evidence gathered during the stop at 1708 Rose Lane and the search of the apartment and its storage closet must be suppressed because his constitutional rights were violated. As the Government correctly, and politely, notes, Rojas' "supporting brief is less than pointed." Doc. No. 87 at 5. He generally seems to argue that virtually every step of the investigation was somehow illegal. Based on his brief, and the statements of his counsel during the hearing, I believe Rojas contends the

following actions violated his constitutional rights and justify suppression to some extent: (a) Younie's stop of Rojas and entry onto the alleged curtilage of 1708 Rose Lane, (b) questions posed to Rojas concerning his address, (c) the arrest, (d) Flikeid's entry onto the alleged curtilage of 1708 Rose Lane to observe the truck, (e) the seizure of keys from the apartment and the use of those keys to open the storage closet and (f) the seizure of three gift cards while executing the first warrant and the use of those gift cards to support the application for the second warrant .

The Government argues that both warrants were properly issued upon findings of probable case based on legally obtained evidence. The Government contends the stop of Rojas was legal and that the evidence obtained as a result of that stop was properly used to obtain the first warrant. The Government also argues that seizing keys that were in plain sight on a coffee table and testing them to determine if they would open the storage closet was not a Fourth Amendment violation. The Government further contends that the officers acted properly in obtaining the second warrant and searching the storage closet only after that warrant was issued. Finally, the Government argues that even if either of the search warrants was issued improperly, suppression of evidence is not appropriate because the SLPD officers acted in good faith in relying on the warrants.

### A. *Was The Stop, The Arrest And/Or The Entry Onto The Property Unlawful?*
#### i. *Applicable Standards*

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend IV. A "search conducted outside the judicial process, without prior approval by judge or magistrate, is *per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967). This "protection extends to the curtilage surrounding a home," *United States v. Wells*, 648 F.3d 671, 675 (8th Cir. 2011) (quoting *United States v. Weston,* 443 F.3d 661, 666 (8th Cir. 2006)), "which is the area to which extends

the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore, has been considered part of the home itself for Fourth Amendment purposes." *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "Consequently, curtilage generally should be treated as the home itself." *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)). The Eight Circuit has explained:

> The "centrally relevant consideration" in any curtilage determination is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." . . . We resolve such questions "with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by."

*Wells*, 648 F.3d at 677 (quoting *Dunn*, 480 U.S. at 301).

Fourth Amendment rights are personal rights that may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). A search does not violate an individual's Fourth Amendment rights if he or she has no legitimate expectation of privacy in the invaded place. *Id.* at 143. An overnight guest has a legitimate expectation of privacy in his or her host's home. *Minnesota v. Olson*, 495 U.S. 91, 97-98 (1990).

Notwithstanding the warrant requirement, a law enforcement officer may seize a person and conduct a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989). An officer's suspicion is reasonable and articulable if he or she "knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed." *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (citing *United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003)). Courts must use a totality of the circumstances analysis when determining whether an officer had reasonable, articulable suspicion or a "particularized and objective basis" for his or her suspicion. *United States v. Arvizu*, 534 U.S. 266, 273

7

(2002). The totality of the circumstances includes, but is not limited to, the officer's experience and specialized training, *id*, odd behaviors and actions by the suspect, *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010), suspect's flight upon seeing officers, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), and nervous or evasive behavior, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). The purpose of a *Terry* stop is to confirm or dispel an officer's suspicions, *Florida v. Royer*, 460 U.S. 491, 500 (1983) and an officer may detain in order to determine the suspect's identity or to maintain the status quo while obtaining more information." *Horton*, 611 F.3d at 940 (citing *Arvizu*, 534 U.S. at 273-4).

A suspect may be arrested after a *Terry* stop if the arrest is supported by probable cause that the suspect engaged in criminal activity. *Williams v. Decker*, ___ F.3d ___, 2014 WL 3538499, at *6 (8th Cir. July 18, 2014) (citing *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012)). Probable cause to arrest exists if "the totality of the circumstances at the time of the arrest is sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Id.* (citing *Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013)).

### ii. Analysis

Rojas argues that by following him into the driveway at 1708 Rose Lane and stopping him from going inside the house in order to question him, Younie illegally entered the property and violated his constitutional rights. Rojas contends that Younie had no legal justification to enter the property and therefore, trespassed into the curtilage of the home. The Government argues that the stop and resulting arrest were justified and that Rojas' rights were not violated by Younie's entry onto the property.

***The Stop and Arrest.*** While on routine patrol, Younie observed a truck operating on a public road that appeared to match an active bulletin for a truck connected to credit card fraud at Wal-Mart. The truck has several distinctive features that matched the

8

bulletin. Younie followed the truck on public roadways but did not activate his emergency lights. He testified he wanted to gather more information about the truck and to confirm or dispel his suspicions about the driver prior to initiating a traffic stop, if possible. However, the truck then pulled into a driveway just off East 4th Street. The truck parked in front of a garage that is detached from a residence at that location. While Younie elected to pull into the driveway, he testified that the truck was close enough to the public road to be in plain view of anyone observing from the road. An overhead photograph of the scene confirms this testimony. Gov't Ex. 10.

As Younie pulled into the driveway, the driver got out of the truck. Younie noted that the driver was a Hispanic male wearing tan Carhart-style overalls, which matched the subject description in the bulletin concerning the credit card fraud. Based on the totality of these circumstances, Younie was justified in stopping Rojas without a warrant to conduct a brief investigation to confirm or dispel his suspicions. Moreover, upon making a proper *Terry* stop and confirming that both the driver and the vehicle appeared to match the Wal-Mart store videos, Younie had probable cause to believe Rojas had committed the offense of credit card fraud. Neither the stop nor the resulting arrest was an unlawful seizure.

*Curtilage*. Younie was also justified in following Rojas into the driveway of 1708 Rose Lane. Rojas argues that the driveway was part of the curtilage of the home, however, this argument is not persuasive. The *Wells* framework analyzes the question of curtilage with four main factors; "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Wells*, 648 F.3d at 677 (quoting *Dunn*, 480 U.S. at 301). Here, the driveway is located just off a public road. While it is not particularly far from the home, it is separated from the home by a detached garage. The driveway is not included within an enclosure and it appears that no steps have been taken protect the area from observation by passersby. Rojas admits he could

not reasonably expect that members of the public would not observe whatever he might do in that driveway. Doc. No. 81-1 at 8.

Nor did Rojas offer evidence of any uses to which the driveway area is put. Based on the photographic evidence, it appears that the driveway is used for the obvious purpose of parking cars just off the adjacent street. Gov't Ex. 10. Any motorist visiting the home, whether solicited or unsolicited, would likely park in that driveway, at least if he or she approaches the home from the East 4th Street side.[1]

For all of these reasons, I find that the driveway at issue is not within the protected curtilage of the home at 1708 Rose Lane. Moreover, I note that even if the driveway qualified as curtilage, Younie's stop still would not have been in violation of Rojas' constitutional rights. Younie had reasonable, articulable suspicion to support a brief investigatory stop. The fact that Rojas left the public roadway and drove onto the adjacent driveway did not remove that suspicion or magically immunize Rojas from an otherwise-appropriate *Terry* stop. When officers who are not armed with a warrant knock on a door or initiate a conversation, "they do nothing more than any private citizen might do." *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011). Here, pulling into the driveway and initiating a *Terry* stop at that location did not violate Rojas' rights, even if the driveway could be considered curtilage.[2]

The same analysis applies to Flikeid's subsequent visit to the scene to view the truck. He testified that he walked around the truck while it was still parked in the

---

[1] A second driveway in front of the home is accessible from Rose Lane. Gov't Ex. 10.

[2] I further note that even if the driveway is within the curtilage of the home, Rojas has failed to show that he, personally, had any legitimate expectation of privacy in that location. Rojas presented no evidence that he was the owner or occupant of, or even an overnight guest at, 1708 Rose Lane. Instead, the only evidence in the record concerning his residence indicates that he resides at 801 Erie Street, Apartment 8. Even if Younie acted improperly by entering the curtilage of the residence, Rojas has failed to prove that his own personal Fourth Amendment rights were violated by that action.

driveway in order to verify Younie's belief that it matched the truck in the store video. He did not search the truck or do anything other than observe it while it was parked. Regardless of whether the driveway could be considered curtilage, this extremely limited encroachment for the purpose of viewing a parked vehicle that could be seen from the adjacent, public street did not violate Rojas' Fourth Amendment rights.

### B. Did Asking For Rojas' Address Violate His Fifth Amendment Rights?

#### i. Applicable Standards

The Fifth Amendment shields a criminal suspect from being compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. Law enforcement officers must advise a suspect of his or her right to remain silent during any custodial interrogation in order for statements made by the suspect to be admissible. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, not all inquiries to a suspect in custody amount to interrogation. *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985). Interrogation, for *Miranda* purposes, means questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *United States v. Ochoa–Gonzalez*, 598 F.3d 1033, 1038 (8th Cir. 2010). Thus, for example, interrogation does not generally include "routine processing-type questions" such as name and address of the suspect. *United States v. Lockett*, 393 F.3d 834, 837 (8th Cir. 2005).

#### ii. Analysis

Rojas provided his address at least twice during the relevant events. First, when Younie asked Rojas the address at their then-current location, in order to call for a tow truck, Rojas apparently misunderstood the question and responded with the 801 Erie Street, Apartment 8, address. After Younie clarified the question, Rojas provided the Rose Lane address. At that time, Rojas was in police custody. While he was not

handcuffed, Younie testified that Rojas was not free to leave and would have been pursued if he would have attempted to do so.[3]

Second, after Rojas was placed in an interview room and advised of his *Miranda* rights, he invoked his right to refuse to answer questions. He was then asked some basic processing questions, such as name, address and date of birth, in preparation for being booked at the jail. He again stated that his address was 801 Erie Street, Apartment 8. Rojas contends that both inquiries violated his Fifth Amendment rights and, therefore, that it was improper to use his responses to make the showing of probable cause necessary to obtain search warrants for his apartment. I disagree.

As noted above, "routine processing-type questions" are not considered interrogation for purposes of a Fifth Amendment analysis. *Lockett,* 393 F.3d at 837. Moreover, the evidence demonstrates that when Rojas first supplied the Erie Street address, he did so in response to a different question. Younie did not ask Rojas where he lived but, instead, asked for the address of their current location. Rojas's response was thus a voluntary statement, not a response to a custodial interrogation. Volunteered statements are not barred by the Fifth Amendment. *Id.* (citing *Miranda*, 384 U.S. at 478). Rojas' statements concerning his address were not procured in violation of his Fifth Amendment rights.

C.  **Were The Search Warrants Supported By Probable Cause Based On Lawfully Obtained Evidence?**

   i.  *Applicable Standards*

Probable cause to issue a search warrant exists if the affidavit in support of the warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair

---

[3] A person is "in custody" when he or she is formally arrested or when his or her freedom of movement is restrained to a degree equivalent with formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam).

probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Warford,* 439 F.3d 836, 841 (8th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When reviewing the decision of the issuing judge, the court must determine if the issuing judge "had a substantial basis for … conclud[ing] that probable cause existed." *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003). If the issuing judge relied solely on the supporting affidavit to issue the warrant, then "only that information which is found within the four corners of the affidavit" may be considered in determining the existence of probable cause. *United States v. Olvey*, 437 F.3d 804, 807 (8th Cir. 2006) (citing *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)).

Probable cause is determined by considering the totality of the circumstances and the issuing judge's resolution of the question "should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)); *see also United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010); *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007). Probable cause "is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 577 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231). As such, the court examines the sufficiency of a search warrant affidavit using a "common sense" and not a "hypertechnical" approach. *Grant*, 490 F.3d at 632 (citing *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)).

If a reviewing court determines that any information provided in support of a search warrant application was obtained illegally, that court should excise the illegal information and determine if the remaining, legally-gathered information supports a finding of probable cause. *Franks v. Delaware,* 438 U.S. 154, 171-72 (1978); *United States v. Madrid,* 152 F.3d 1034, 1039 (8th Cir. 1998). If so, then the warrant is valid despite the fact that it was obtained, in part, on the basis of illegally-obtained evidence.

*ii.     Analysis*

*1.     The First Warrant*

Flikeid's affidavit in support of his application for the first warrant provided detailed information about the SLPD's investigation of the credit card fraud reports. Flikeid summarized the video evidence, the similarities between the truck depicted in the videos and Rojas's truck, the similarities between the Carhart-style coveralls depicted in the videos and the clothing Rojas was wearing when he was stopped, and noted that Rojas appeared to be roughly the same height and weight of the suspect shown in the videos. Gov't Ex. 2 at 5-8. Flikeid then described Younie's encounter with Rojas on November 12, 2013. *Id.* at 7. Next, he reported that after Rojas was taken into custody, SLPD officers reviewed the videos and confirmed that Rojas was the individual shown in those videos. *Id.* at 7-8. In the endorsement to the first warrant, the issuing magistrate noted that Flikeid also stated, under oath, that the address to be searched was reflected on Rojas' driver's license and had been acknowledged by Rojas as his residence.[4] *Id.* at 11.

In considering the totality of the circumstances, I find that the information provided to the magistrate easily established probable cause to search 801 Erie Street, Apartment 8. That information set forth "sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Warford*, 439 F.3d at 841. Moreover, as discussed earlier, I find that all of the information set forth in the application was legally gathered. As such, I

---

[4] Even if Rojas' statements concerning his address were obtained in violation of his Fifth Amendment rights, and thus excised from the search warrant applications, probable cause nonetheless existed to search the apartment at issue in light of the fact that Rojas' driver's license reflected the 801 Erie Street, Apartment 8, address. Gov't Ex. 2 at 11; Gov't Ex. 3 at 11. To obtain an Iowa driver's license, an applicant must provide a residential address and submit proof of residence at that address. 761 Iowa Admin. Code §§ 601.1(6), 601.5(3). A licensee must then notify the Iowa Department of Transportation of any change of address within thirty days. 761 Iowa Admin. Code § 605.12(1). While the address shown on a driver's license may not constitute irrefutable evidence concerning the licensee's current residence, it at least supports a probable cause finding.

reject Rojas's challenge to the first warrant and recommend that the evidence gathered during the execution of that warrant not be suppressed.

### 2. *The Second Warrant*

For the most part, the same analysis applies to the second warrant, as it was based on largely the same evidence that was presented in support of the first warrant. However, Rojas makes two specific challenges concerning the issuance of the second warrant. First, he complains that the SLPD's seizure of a set of keys while executing the first warrant, and their use to open the storage closet door, was unconstitutional. Second, he contends that the seizure of three VISA gift cards, and the subsequent reference to them in the application for the second warrant, was improper. Both arguments are baseless.

#### a. *The Keys*

The first warrant expressly authorized law enforcement to search the apartment for specified items and to seize those items, if found. Gov't Ex. 2 at 13-16. Those items included "[e]vidence of occupancy, residency and/or ownership of the premises described above including but not limited to . . . keys . . . and/or keys relating to safety deposit boxes." *Id.* at 14. While executing the first warrant, the officers observed keys in plain view on a coffee table. Upon discovering storage closets in the common area hallway with numbers that correspond to apartment numbers, they suspected that the keys on the coffee table might open storage closet number 8. They took the keys to that closet, inserted one into the lock and confirmed that it opened the door. After briefly looking into the closet, they shut the door and secured it before applying for the second warrant.

Rojas contends that his Fourth Amendment rights were violated by the seizure of the storage closet keys and their insertion into the storage closet door. He argues that the first warrant did not authorize law enforcement to seize the storage closet keys and that inserting the keys into the lock amounted to an unlawful search. He complains that

these allegedly-unlawful actions were then used to procure the second warrant. I disagree.

The keys to the hallway storage closet were lawfully found and seized within the scope of the first warrant. The warrant expressly permitted the seizure of items constituting "evidence of occupancy" and listed, as examples, both "keys" and "keys relating to safety deposit boxes." Gov't Ex. 2 at 14. Keys to a storage closet located in the common hallway plainly fall within the scope of that warrant. Thus, the initial seizure of the keys pursuant to the first warrant was not improper.

Nor was their insertion into the storage closet door. Simply inserting a key into a lock to determine whether it fits is not a "search." *United States v. Cowan*, 674 F.3d 947, 955-56 (8th Cir. 2012) (citing *United States v. Salgado*, 250 F.3d 438, 456 (6th Cir. 2001)). Here, the officers observed that the storage closet doors were numbered in the same fashion as the apartments. Thus, it was reasonable to suspect that closet number 8 was associated with apartment number 8. Upon finding a set of keys in the apartment, it was appropriate to confirm this suspicion by testing the key before seeking a second warrant. Doing so was not an unreasonable search or seizure.

After confirming that the keys fit closet number 8, the officers sought a second warrant to authorize a search of that closet. The application for that warrant referenced the keys and indicated that they had been found to open the closet. Gov't Ex. 3 at 9. The magistrate's endorsement of the application noted Flikeid's clarification that the keys "were found in plain sight on the top of a coffee table in the apartment." *Id*. at 11. Because the keys were seized and tested in the closet door lawfully, it was entirely appropriate for the magistrate to rely on this information to issue the second warrant. This means, in turn, that evidence found in the storage closet while executing the second warrant was gathered lawfully and is not subject to suppression.

### b. The Gift Cards

Rojas complains that three VISA gift cards were seized during execution of the first warrant even though such cards were not specified in that warrant. He then contends that the reference to those cards in the application for the second warrant was improper, suggesting (I assume) that this invalidates the second warrant.

Rojas is correct that the first warrant did not list VISA gift cards as specific items that law enforcement could seize. That warrant referenced various credit cards (by the law four digits of their numbers), plus "Wal-Mart gift cards" and "Receipts of gift card purchases." Gov't Ex. 2 at 14. It also referenced "Any property found to be stolen after checking law enforcement computer records" and various types of financial records, such as "books, records, receipts, bank statements and records," etc. *Id*. Flikeid testified that while executing the first warrant, he located the VISA gift cards in the same location as other items referenced in the warrant. He believed that because of the nature of the case, anything with a magnetic strip had evidentiary value. As such, he added those cards to the application for the second warrant to obtain authorization to seize them.

That application does, in fact, include a handwritten reference to "Gift cards." Gov't Ex. 3 at 2. Flikeid's affidavit in support of the application describes the three VISA gifts cards, among other things, as items located while executing the initial search warrant. *Id*. at 9. The second warrant then authorized the seizure of "Gift cards." *Id*. at 14.

Under these circumstances, I have no idea what Rojas is attempting to argue. It was certainly reasonable for Flikeid to suspect that the VISA gift cards had evidentiary value to the investigation because of their nature. While those cards were not expressly referenced in the first warrant, they were found while the officers were lawfully executing that warrant. Flikeid then went back to the magistrate and obtained a second warrant that, among other things, authorized the seizure of the gift cards. It is difficult to imagine how the SLPD officers could have acted with more regard for Rojas' rights.

17

Moreover, I reject Rojas' apparent argument that the second warrant, and the resulting search of the storage closet, was somehow tainted by reference to the VISA gift cards. Probable cause to issue the second warrant, and thus search the storage closet, was not dependent on law enforcement's discovery of three VISA gift cards. Instead, probable cause arose from all of the evidence that supported the first warrant, plus the facts that (a) the storage closet number matched the apartment number and (b) keys found in the apartment were determined to open that storage closet. Even if the VISA gift cards had never been found, probable cause would have existed to issue the second warrant.

In short, I reject Rojas' challenges to the second warrant because, like his challenges to the first warrant, they have no basis in fact or law. Both warrants were properly issued. Rojas is not entitled to suppress evidence gathered upon execution of those warrants.

### D. Does The "Good Faith" Exception Apply?

In light of my determination that both search warrants were valid, the Government's argument for application of the "good faith" exception to the exclusionary rule, as described in *United States v. Leon*, 468 U.S. 897 (1984), is moot. Nonetheless, because this Report and Recommendation is subject to the district court's *de novo* review, I will briefly address that argument.

"Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Houston*, 665 F.3d 991, 995 (8th Cir. 2012). "The 'good-faith' inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *Id.* Rojas argues the good faith exception cannot apply because Flikeid, who applied for and executed the search warrants, should have known that those warrants were invalid.

There are four circumstances that will prevent the application of the good faith exception:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge 'wholly abandoned his judicial role' in issuing the warrant; (3) when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*'; and (4) when the warrant is 'so facially deficient' that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *United States v. Proell*, 485, F.3d 427, 430 (9th Cir. 2007)) (emphasis in original). Based on the evidence presented, I find that none of these circumstances are present here. It was entirely reasonable for Flikeid and the other SLPD officers to believe that the search warrants were valid. Therefore, even if it is determined after the fact that the warrants were not supported by probable cause, *Leon's* good faith exception would prevent exclusion of the resulting evidence.

## IV. CONCLUSION

For the foregoing reasons, I RESPECTFULLY RECOMMEND that defendant's motion to suppress (Doc. No. 81) be **denied**.

**DEADLINES:** Because trial is scheduled to begin October 20, 2014, objections to this Report and Recommendation must be filed by **Wednesday, October 8, 2014.** Responses to objections must be filed by **Monday, October 13, 2014.**[5] Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **Tuesday, October 7, 2014,** regardless of whether the party believes a transcript is necessary to argue the objection. If an attorney

---

[5] While it is unfortunate that these deadlines must be compressed to this extent, this is necessary because Rojas did not file his motion to suppress until after the deadline for such motions and, therefore, had to seek relief from that deadline. Doc. Nos. 82, 84.

files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 3rd day of October, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE